May it please the Court. Good morning. My name is Fred Taylor. I'm an attorney with the law firm of Stalins, Bush & Randall in Virginia Beach, Virginia. I'm joined today by my co-counsel, Kirk Lyons, with the Southern Legal Resource Center in North Carolina, who has served as both trial and appellate counsel for C. H. throughout these proceedings. Before the Court today are the following issues. Whether the District Court erred in granting summary judgment to the Appellees on First Amendment claims in regard to specific Confederate battle flag clothing. Second, the same First Amendment claim as to what had been deemed in the record as protest shirts. Third, whether the District Court erred as to 14th Amendment due process claims as to unequal enforcement of the dress code, an address code that is unconstitutionally vague. And finally, the issue of whether the District Court erred in granting summary judgment as to the issue of qualified immunity. The appellate would submit that on all accounts the District Court erred in the granting of such summary judgment. What's your strongest argument on any one point? What's your strongest argument that the Court made a mistake? I think the strongest argument would go to the protest shirts, Your Honor. Even the Appellees themselves conceded at numerous points in this record that the protest shirts would and should be allowed. Tell us first, which ones do you say are the protest shirts? Your Honor, the protest shirts would be the exhibit numbers. It's Joint Appendix 20, or actually it starts, I believe, at 54. Well, there were some numbers. I think Judge Agee was asking about the numbers. The letters. The R-S-T-U-M. Which ones of those do you say are protest shirts? It would be the ones that the U.S. flag flew over slavery for 90 years, the ones offended by school censorship of Southern heritage, the Jesus and the Confederate battle flag banned from our schools but forever in our hearts. H-M-R-S. Honorary member of the FBI. And T, right? The freedom of speech for all except Southerners, and public schools should educate, not discriminate, against the U.S. flag. The other shirt that I would submit to the court would be the shirt involving the U.S. flag flew over slavery for 90 years, because this is the shirt that both sides agree should be treated as a protest shirt. The Appellees do not agree that the other shirts should be treated as protest shirts. And based on this, the Appellees... The other shirts have the letters cut out of a battle flag. So that's... Well... And the letters are cut out of a battle flag. It's not clearly obvious, but that would still, if somebody recognized that, would still invoke the same type of emotional response. Well, Your Honor, I would submit that, not knowing the context of the situation, the... But isn't that shirt, isn't it supposed to be recognized? I mean, it wasn't unintentional. It was cut out of the battle flag, correct? It was. Okay. But certainly looking at it... With some purpose, I take it. It also looks like any type of... With some purpose, I take it. Certainly. To make a political statement regarding the protest... Including the battle flag. Certainly. Okay. Let me ask you this question, and along that line. It's not obviously the battle flag. You'd have to look. But anybody knowing it would recognize it, I suppose. If you had a t-shirt that said, I hate... And then had a coded word, you couldn't tell what it meant. It was actually in code. And everybody says, what's she wearing? What's that code? And a girlfriend finally says, well, that code is a code for N-word. This is the... Breached the code. And it spreads around the school. Now, it's not obvious that that was what she was wearing. But as soon as everybody learns or recognizes it, it creates the same protest as if she had worn, I hate N-word. And so wouldn't this FBI cut out of the battle flag, or all of these cut out of the battle flag, except the one you point out, the first one. Wouldn't they invoke the same type of response as soon as they were recognized? Here she is now flaunting something that's very politically and emotionally sensitive. Well, I think it's an apple-starred orange's comparison, Your Honor. Because I think the situation with the I hate N-word would probably fall under a standard more like the Frazier standard. Except she didn't put it on. She put just code. She didn't want to run afoul of the regulations. So she created a code. And she substituted a given letter, an established code, a given letter for every letter in the N-word. And that's what she wore around. And it didn't make any sense to anybody. And, well, what are you wearing? That's sort of goofy. And then all of a sudden, a girlfriend says, well, she's got a code and this is what it means. And it spreads around the whole school. And now it's even more enticing. It seems to me the problem doesn't go away just because it's not as manifestly depicting. It goes away. I mean, the problem is still the message that's on the content of the shirt. And under the First Amendment, we have to look at that in the school context. And you raise an excellent point. That is the context of the shirt. And I would submit in this case, it's a lot different from someone making what I would consider, and I think most would consider, a lewd or vulgar comment. And you would have a standard. Some people may be more offended by this than a very lewd word. The question is then, what standard do we apply? And I think a comment like that, just like in Frasier, where there's something full of sexual innuendos, something that's lewd, curse words, and things like that, which are specifically banned in this dress code, is a much different situation than the context of a very benign wearing of a t-shirt. What's a school district to do under the law? And what's a school district to do, just using common sense? If they have something that in some context may just be clear political speech and open for public debate in a forum in a town square, they have to factor in more than that. They have to teach children, and they have to keep some semblance of order. What are they to do? Don't we give them some deference in how they run the school? Your Honor, I think we already give them a lot of deference, and I think public policy would promote- How do we do it in a case like this, when there's a shirt that has something that clearly, they say, will cause a problem? What are we to do then? I think it's time to use and make an educational effort to teach students. Some of these other cases- Wait, what does that mean? You mean the school board should have part of their curriculum to teach the students? What? I think respect for the First Amendment is a key part of that, and respect for other cultures and other heritages. Now wait a minute, now wait a minute. You mean in schools where, quite frankly, children are having trouble passing the exit exams when they're seniors, you want them to add something else to the curriculum about the First Amendment? I'm not- They get some First Amendment, I'm sure, in some class. But your proposed solution is have them add a course on First Amendment to the curriculum? I'm not necessarily suggesting a specific curriculum, but the record itself speaks volumes about school officials working to promote tolerance, school officials working to not have problems like they did have, and the record shows this. How does that work into the Tinker Test? If there's sufficient evidence to show a reasonable apprehension of substantial disruption to the school, are you saying that there's some sort of educational requirement that changes the Tinker Test? I'm not understanding kind of where you're going here. Well, the Tinker Test is two parts, as the Court knows, that being whether the expression would, not may, not might, not probably, would materially and substantially interfere with the requirements of appropriate discipline in the operation of school, or if there's no evidence that it would, whether there's such factors here which would reasonably have led the school authorities to forecast such a disruption. And there is an interesting explanation in Tinker that I'll raise to the Court. That is, you know, the school argued in Tinker to the Court that their ban was based on a fear of a disturbance. In my opinion, no different than the fear of disturbance that we have in this case, since there is no actual disturbance caused by any of the T-shirts. But the majority explained in Tinker that undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression. And they went on further to say that there may be an instance where an expression made in class or a cafeteria might deviate from the views of another. And as a result, they even suggest an argument or a disturbance would commence. But they note, and this I think answers all three of the questions you just proposed, our Constitution says we must take the risk. And our history says it is this sort of hazardous freedom. Let me ask you this. If a school is having problems delineating what's appropriate and what's not, they're trying to follow Tinker, they police what students wear, they don't even like the way people some wear their jeans and torn T-shirts, could the school impose a requirement to wear uniforms? They certainly could. And the courts have allowed that as long as it's even-handed. What would be the reason that a school would do that? And I'm sure it's based on promoting uniformity and not having a question of fashion issues or socioeconomic issues that would prejudice one student against another. Why isn't that unconstitutional? The student says, I want to wear a shirt that says, I love the First Amendment. And the teacher says, no, you wear the uniform. And if they had set those rules out on the onset and it was applied even-handedly, they haven't set the rules. And that's one of the problems in this case with the equal protection claim. I mean, we have a dress code here. We have the First Amendment clearly applicable. Tinker tries to define the scope. But there is a need to balance the First Amendment rights in a school context and the right or really the need of the school to make citizens of our students. It's not just to learn math and to read. But they have to be learning values. They have to be learning how to organize and live in an organized society and a democratic society. And the greater success the school has in that, the greater success we'll have in our country. And we've always recognized that in schools, we have to give some latitude to let our teachers and school administrators assist in raising and educating children in this direction. And this is not a malicious effort to suppress the First Amendment. They can go down and march in any parade they want. They can go and join any campaign. They can carry posters. They can write articles in the local newspapers. But when they're in school, there's got to be some kind of order that they're allowed to do. And these principals, in this case, really made an effort. They took pictures of what they did. They had a code. They tried to monitor it. And now you're saying they guessed wrong and they should be paying for it. Your Honor, I think exactly what it is is a guess based on little information. But we have a lot of law that says bad guesses in gray areas. But Tinker doesn't allow that. Is immune. Tinker is very clear that it either needs to be a disruption or that they have a reasonable forecast of a disruption. And I think the real latitude... Why isn't there a reasonable forecast in Latter South Carolina that the flag has caused issues in the past? Why isn't it a reasonable guess that it would cause problems in the future? Why isn't that a reason within that latitude? Does that seem extreme to you? For some people to think that some students would be so offended by the Confederate flag, battle flag, that they wouldn't like it. It would cause a problem for them. That's not much of a guess, is it? Unfortunately, a lot of people are offended by a number of things. I didn't ask you about the Confederate flag. It's what I asked you about. In the context of Latter South Carolina, racial unrest in the history of Latter, is it that far off to guess that a Confederate flag in today's society might be very offensive to some people and it might cause a problem? How much of a guess is that? I think the record shows, Your Honor, that it's a generational issue. And the fact that C.H. herself on numerous occasions... Why didn't the record show that it's a generational issue? You think there's overwhelming acceptance by all quarters of the Confederate battle flag in Latter South Carolina now among young people? I don't, Your Honor. Then how is it generational? It's generational in the sense that on numerous occasions, C.H. wore this clothing, wore battle flag clothing, wore clothing, protest clothing, without incident. I know, but that's fine. That may say that some people are tolerant, but maybe some people... The school board says, look, maybe people didn't see it. Maybe people didn't really get upset the first time because they're trying to be good fellow students. But we see, based on the history we've had here, and wasn't there an incident after this occasion where there was some disruption over a Confederate belt buckle? Yes, and in those instances, certainly could not be used in regards to a basis against C.H. But it certainly can be used to assure us that their subjection, their guess about what might happen, isn't that far off? It still cannot be a guess, Your Honor. It has to be reasonable. Well, it is a guess when we're looking at immunity. If these officials are trying to follow the law and trying to educate these children not to fight, but to get along together, and one of the mechanisms is not to have this kind of provocative conduct, it seems to me that there is some room for that under Tinker, and they were trying to run that course. And it seems to me that our jurisprudence says if they made a mistake, a good faith mistake, they weren't deliberately trying to violate the First Amendment. They were trying to bring these students into a harmonious community. And I find it a little difficult. You know, this young lady would come to school with a pocketful of these shirts, and they'd tell her, you can't wear that. So she'd take it off, and then she'd put on another one. And they'd tell her, that's no good, and she'd take it off and put on another one. Now, what's she up to? She wants to disrupt that community. And that's what they were trying to prevent. They need to educate these kids. They don't need to have protest marches in school. Couldn't they stop a protest march? I don't believe that's in the record, Your Honor. No, I'm talking about generally. I mean, we're talking about a school context. I understand my time has gone over. May I finish? Of course, please. Thank you, Your Honor. To begin with, in regards to the qualified immunity issue, I do not believe that they can have qualified immunity in a case where their own dress code, both the middle and the high school, do not follow the clear, bright-line tinker test that's been in place for years, but rather has a general test that leaves it very subjective as to determining what is offensive or not offensive. Because what may be offensive to, you know, Principal Hayward or Principal Liebenrud at latter schools may not be offensive to some other person. So that's a big part of this question. That's societal. That may be a societal issue. But the question in a school, a superintendent or a principal trying to keep order in the school has to make some judgments on these things, right? Certainly. And these judgments are in a range prescribed by the code, but you can't sit there and anticipate every T-shirt that might come in or every piece of clothing. You have to have some judgment. And the question is, were these officials trying to violate the First Amendment? They certainly were on notice that it was a constitutional issue for CH, and based on that notice, especially with the protest shirts, especially with the shirt involving the U.S. flag and such, should have known under the qualified immunity standard that this is not a situation where they get such latitude. Do I understand that they did allow her to wear what she calls some protest shirts in light of this litigation? They basically went back on their word, Your Honor, and that's what the record shows. Why do you say they went back on their word? They were trying to be peacemakers. The record shows, Your Honor, that all of the shirts were, she was told, because they didn't agree that these were protest shirts, that she could not wear those. The only one that was not disputed became the shirt involving the U.S. flag. And she had already been told that she couldn't wear that shirt by Defendant Hayward. If I may reserve the rest of my time, Your Honor. Thank you. You have some rebuttal time. All right. Mr. Lead? Lied. Lied. Thank you. Thank you. Well, we're back again, and we hope that this time that we- Well, we enjoy seeing you. Thank you, Judge Smith. You probably don't enjoy seeing us quite so much. Oh, yes, I do. We think that we closed the gap. We went back, and Judge Wooten, in his final order, goes through what were called the protest shirts. And in looking at the protest shirts, we began to realize that, indeed, they had the Confederate flag in them, all except one. And they fell within that group that we definitely said could not be worn because they did have the Confederate flag. The only one that doesn't have the Confederate flag in it, as counsel says, is the one that has the United States flag, and it says under it words to the effect that the flag flew over legalized slavery for 90 years. Before you get into that one, let me ask you a preliminary question. As I read the second order, essentially, as I read it, the district court judge made findings of fact that all of the flags, except the one you were just talking about, were basically flag shirts, not protest shirts. There are three of them that I had some question about. I've looked at the pictures in color, and they don't seem to be quite as clear to me that they show the flag. By that, I mean the Confederate battle flag as some of the others, and those are M, T, and U. They certainly have the Confederate battle flag colors in it, but those are the same colors as the United States flag. Yes, sir. So why is that sufficient to grant the award of summary judgment as opposed to being a dispute of fact? I don't think there's any doubt. In Judge Wooten's mind, there was no doubt that those were shirts that had the flag in it because of the colors and because of the cross in there. But I don't think that that created anything that could not be handled. I'm looking at Exhibit T, and I can see the colors, but I can't see the cross. I mean, why is this different from American flag, United States flag colors? It's very close, but if you look at it, I think, and I'm fumbling around trying to find it. The color photographs make it clearer than the black and white. It's not very clear on the black and white. I'm sorry, I'm talking about you, my mistake. Yes, sir, and I was going to call the Court's attention, and don't need to anymore, where the color photographs are in the record. But I think you can still see the outline of the Confederate flag. Yes, the same colors, but not the same design. The other side doesn't dispute that's a Confederate flag cutout, do they? They just said that standing right there, didn't they? Yes, sir. They said that T-shirt, those T-shirts were cutouts. Now, it's true you can see stars and who knows what they're from, but it's more obvious in color, but they don't dispute that it's a Confederate flag cutout there. No, sir. Right? No, sir. You think Judge Wooten didn't think there was any dispute that that was a Confederate flag cutout? I don't think we had any dispute except for the one with the United States flag. I'm talking about Old Glory. I'm talking about the cutouts. Yes, sir. Yes, sir, I don't think he had any problem at all. Well, the issue would be is what kind of reaction would the students have to that? And if the students were to recognize it as a Confederate flag, even though it might take a little while, it seems to me it's a little bit like my hypothetical with a coded word. Yes, sir. It's disruptive. Very much. In the context. And unless it was pretty clear that it was not a battle flag but was a United States flag or something else, but clearly the purpose of the T-shirt was to sort of disguise the battle flag but have it there. Yes, sir. Judge Niemeyer, I think that's absolutely correct. What's your comment about the H? All right. Is H the American flag? I think that a goodly portion of the students that saw that would be very offended by the words legalize slavery. I think they would be very offended. Again, it reminds them of the past of their ancestors that went through. I think they would find that most repulsive. Do you think, is your argument that those words convey what to some the Confederate flag would convey, legalize slavery? Yes, sir. I do. So the district court made a two-part analysis there. One was based on Frazier and there was an alternative finding based on Tinker. Are you advocating both? Yes, I think you could certainly argue both in that. The court has really cabined in Frazier pretty much, haven't they? Yes, sir. They have. And one thing about Tinker that I know the court understands, but in reading it through the years, I at first thought there were two parts to it. And the more I read it, the more I realize there are two ors in there and there is a third part. If it infringes upon the rights of others. And I think that's very important. I think this case does clearly fall under Tinker, but not for the same reasons that opposing counsel might say. But Frazier does fit, too. We wouldn't have to rely on that if we didn't want to. No, sir. Not at all. I wanted to just touch a few things because I know the court is very aware of the factual situation. But the latter school administration is very stable and I think they're outstanding. Their superintendent, John Kirby, and the two high school principals who were the named defendants in the case, all have over 30 years' experience. They have a world of experience. They know their community. And they know what is offensive and what is not offensive. And, Your Honors, there's no icon, there's no symbol out there that in this day and time that is as offensive to our African-American citizens as it is to the Confederate flag. What do you do with that? I take it you mean the offensive symbol is the Confederate flag. What do you do in a state like South Carolina where it's mandated that that symbol flies right on the Statehouse grounds? Yes, sir, it does. That's the first thing you see at the Statehouse grounds? Yes, sir. How do you reconcile that? It's hard to reconcile. It was removed off, as you know, it was removed off the Capitol building and put on a... Actually, when I was a district court judge, I had the case when they were trying to get me to remove it. But I held that in advance and deferred to the state to resolve it. But that doesn't mean it wasn't controversial. Flying that flag on the Capitol grounds was controversial in and of itself. And that's under the full blow of the First Amendment. But we're talking about trying to keep order in schools, in middle and high schools. Yes, sir, and that's why I came back to the fact that these folks know their community. Well, I'll just say this. There might be a lesson in here somewhere for some people in South Carolina that it may well be, and Mr. Lyde, you represent the school board, you're here arguing to us that a student not be allowed, if the board and the school so decides, to wear to school a picture of the Statehouse grounds. Isn't that right? That's true. If it has a Confederate flag on it. That's correct. I mean, that's correct. Yes, sir. It's just I don't disagree with what Judge Niemeyer said, but it seems to me a bit of a conundrum, and maybe some people ought to just stop and take a look at what's going on, that you have law mandating that a symbol be flown, but yet you take a picture of that symbol, and the student may well not be able to wear that picture in a school. That's right. That's right. In that environment, they can't. Uniforms might be better. I sort of like the uniform idea. Yeah? As long as it's not a Confederate uniform. There is an argument that has been made in the briefs that Principal Liebenrud was not across the board in taking out offensive items of clothing. That school district took out a bunch of all kinds of shirts. Yes, sir. Yes, sir. And they're in the record because Mr. Liebenrud was smart enough to take a picture of every one of them, and it was submitted to the district court, a book of all those pictures. He took a bunch of them out. Isn't that pretty clear, that this school district, they just don't want to be in the business of all of making those fine cuts, and they want to, it looks to me like they see their mission as education, and they just don't want to get in the business of who gets to wear what T-shirt on what day, and they basically try to get rid of anything that might be considered offensive to anybody is what it looks like in this school district. Do you read the record that way? Absolutely. Do you think your school district would have more of a problem had they not done that? Yes, sir. Been more selective? Yes, sir. And I think Principal Liebenrud says it best in his deposition, and he was being questioned about the disciplinary record not looking so bad, and he said, we're not out just to punish. We are about education. And that's why when this young lady came in and they would tell her to remove the shirt, they didn't discipline her. One time she got in-school suspension for two hours. How big is Latta? How big is the town of Latta? The town of Latta is just a couple of thousand people. The school itself has the school district has 1,600 students. The district has only three schools. It has the high school, and close by are the administrative offices, and then next door is the middle school, all on one tract of land. And then the third school is the elementary school, and it's a mile or so away. That's the district. Latta has 2,000 people, and there are 1,600 students in the high school? Yes, sir. They come from all the rural areas, yes, sir. They come from the rural areas. And the student body, by everyone's admission, is 50% African-American. They've done a great job. And they have enough battles to fight without this one. One other thing I wanted to mention, and again... You know, it really shouldn't go without some understanding, and I don't know if your colleague on the other side agrees with this, but C.H. was arguing for some historical preservation, some recognition of the history of South Carolina, and she said she felt strongly about that. It seems to me she could go out and write books. She could carry flags. She could go down Main Street and carry a flag if she wanted or a sign. These are all permissible activities in the general community under the First Amendment, but that doesn't mean that the school wouldn't have in a time or place, that is, in the school, regulating that so they could educate the kids and not cause the fights back and forth. I mean, even the Ravens are going to provoke the 49ers with signs, and you're going to have a big disruption. Will it be a public display if the Ravens cry after they lose? I don't know that. I'm teasing the Ravens fan. Mr. Lyden, let me ask you this question. You've been a preserver of South Carolina, and I think probably that part of South Carolina. Yes, sir. You were raised probably not too far from there, I'm guessing. Well, I was raised in Greenville, but the first 16 years of my practice, I was in Hart School, which is in the same judicial circuit with Dillon County, which is where Laddick... You've seen the world turn, and it strikes me a little bit, and it should be noted a little bit of the irony. You probably remember protests from the late 60s when Confederate battle flags were waved, and part of that claim was the federal courts should have nothing to do with controlling our schools. Yes, sir. Remember that? Yes, sir. And now we find ourselves where we want the federal courts to tell our schools what to do. So a bit of a turn of the worm there, isn't it? Yes, sir, and I recognize you're trying to tell the court, too, that I'm older than you are. I thought that was obvious, but maybe I should tell you. I should have learned. I saw it, too, though. The truth is I saw that same thing. Right. I know you did. And by the way, there is a First Amendment claim to be protected in school. There is. But the question is, just we've talked about it, you have to give the school districts and those people who are charged with educating those children, that's their primary mission. And I think, quite frankly, as Neymar makes a very good point about uniforms in school, and without being too immodest, I had school uniform cases in front of me as a district judge, and I ruled basically that school uniforms were permissible. I thought the schools could do that. Yeah. And part of that is not just to rule out disparity in socioeconomic classes, and some kids have money and some don't, but it also focuses children on maybe school districts can decide they can focus on what they need to do most, which is that, I think Judge Neymar is correct, and I think you would agree, there are other forms and places for people to talk about the battle flag and heritage and all that, and welcome to it. Glad to have that discussion. It's just this school has decided they don't want that done, and their school, if the chance is, and I suspect, don't they teach history in that school? Sure. So they teach about the war between the states, the Civil War, don't they? Yes, sir. And so that, do they have clubs at that school, like Southern Heritage Clubs and stuff? Do you know? I'm just asking. It may or may not be in the record. I don't think so. Okay. There's nothing in the record, but I don't think so. But they do a good job in this small school district. They really do. But they're in an agricultural society that they do very well indeed. What is the deference, if any, that courts should give to school principals and superintendents with respect to First Amendment issues? Absolutely. Tinker talks about a particular, the armbands and the war, but hasn't the Supreme Court talked about some kind of deference in the educational context? Yes, sir. Yes, sir, and then I know one quote that Justice Breyer made in Morris to the saying that, you know, you shouldn't make the courtroom a principal's office. They do need some deference. And the latter has been fortunate to have folks that are quite solid. I see that my time is drawing close, but I did want to say one thing, and I know I don't have to say much because you know Kowalski, you know the case of Kowalski v. Berkeley County Schools. And when I first looked at it, I thought that was a South Carolina case because we have a Berkeley County, but this is West Virginia. You gentlemen on the panel, I don't have to tell you much about the case except to tell you I think it's quite applicable to this case. I do indeed, but I appreciate the opportunity to come back before you. You've got two beautiful orders from Judge Wooten, and before Judge Shedd tells our audience today, I will, and that is that Judge Wooten is a Wofford graduate, and he has a Phi Beta Kappa key also. But that's not something we're allowed to take into consideration whether to affirm him or not, is it? All right. Thank you, Mr. Leib. Thank you. We ask that you affirm the decision of the lower court. Thank you. Mr. Taylor, you have some rebuttal? Thank you, Your Honor. I want to be sure I understood what you had stated in your opening argument, particularly with regard to Exhibits U, T, and M. Did you agree that those were cutouts from the Confederate battle flag? Well, I certainly don't know if the intent is shown in the record by the maker or either C.H. in this case. It could very easily be looked at as patriotic bunting. I know, but what did you say? Me, personally, I don't think really adds to this question. Didn't you say you thought there were cutouts of the battle flag? Isn't that what you said? Her point was— I said what you said. That's correct, in the sense of her point was she was protesting the ban. It has the same colors as the battle flag. Well, it's more than that. I think it gets to be disingenuous when we start looking at these things and saying they're not cutouts of the battle flag. Sure, it could be another flag. It could be some other flag in some other country in the United States. But you look at this thing, and it's got all the little details, and it's pretty clear that that's what was trying to be done. The letters were trying to be cut out of the battle flag. Look at the FBI one. And there's no question, Your Honor, it was meant as a protest. But a protest does not— Fair enough, but I just think we ought to acknowledge the facts of the case. I mean, it may be coded. It may be subtle. But it's, I think, unmistakably the battle flag. Now, you say it's not now? I say that anyone could take it to be anything. They could take it to be the U.S. flag, and there's certainly nothing in the record that she said, I know this is the battle flag. It's the same colors, Your Honor, the same stars. It's got the angle here going across the cross, the blue cross, and the little markings on it? But even conceding that if it is, it's still a question of does this pass the bright line test of Tinker? But are you conceding that it is? You said even conceding. I'm just asking. Your position is that—let's just take this Exhibit S. I just want to be clear on this. This honorary member of the FBI, your position is that is or is not the stars and bars as part of that? My position is it is not discernible. The appellees specifically said you can't wear a battle flag, you know, rectangle, square battle flag. And so these protest shirts came up. Certainly it can be conceded that it's subtle, certainly the same colors, the same general design, but it is not the battle flag specifically. You really want to argue to this court that looking at that B of the FBI, you can't see that that's part of the stars and bars of the battle flag? Have you seen that exhibit? I have, Your Honor. And you want to argue to the court that it's not obvious that that's part of the Confederate battle flag? That's your argument to this court? That you rest your legal argument on that factually that is not stars and bars? It is simply intended to protest— So if it's your answer, that would be yes or no. It's not obvious. It's your position. There is nothing in the record that says whether that's a battle flag or not. Well, I know that's fine, but do you want to answer my question? I'm asking you because the judge can look at it, we can look at it, your argument on the facts, this is a factual matter, you argue that factually that is not obvious, that that's cut out of the stars and bars. That's your position to the court? I think it could just as easily be any other flag. So your position is you cannot—it's not obvious? That's correct, Your Honor. But what is obvious is that it was meant to protest that. And some people may look at it as a battle flag, others may not. They may look at it simply as a subtle way to protest the battle flag with not having the actual full battle flag completely shown, just like the other. Your argument is if they told her not to wear the battle flag, if she snipped off one inch of one corner, that wouldn't be the battle flag and she could wear that? That's not it, Your Honor. Excuse me, I'm asking you to answer my question. You just said, in answer to a question, she could not wear the rectangular battle flag. Isn't that what you just said a couple minutes ago? That's correct. I said if she snipped off one corner of that, then she would be in compliance with their instruction? In that case, it would still be substantially the battle flag. I do not believe the protesters are substantially the battle flag. So isn't the issue is what image is taken by the students? It is, and I think it has to be— And you don't think that the students would understand that the FBI there was cut out of the battle flag when she wore that? I think that's the school's position, and I think we have to look at it in context, as I said earlier. And the problem that I see with this case is we're still not prescribing to Tinker, which is the appropriate determination. It's not Frazier. It's not lewd, vulgar, or offensive. It comes back to Tinker. And what the district court has suggested, they state that they're relying on Tinker. And Tinker really focuses on the disruption that the message may call, and the principals and the superintendents of schools have to make the determination as to whether a T-shirt is going to likely, in the context in which it's worn, will cause disruption. And there's quite a background in South Carolina, in this portion of South Carolina. Wasn't there quite a historical— The background in this case and in this record is there have been racial problems decades previous to C.H. wearing this. There were never— Well, they're more recent than decades. I mean, they have a list of them. None of which involved the Confederate battle flag. And I think that's what's interesting here, because what the court suggests is that we say automatically— So if we had racial strife in that school every year, we'd have fights, breakouts, have people calling each other slaves and others calling them slaveholders and arguing the Civil War, but never using the battle flag, you're suggesting that the superintendents would be barred from then using the battle—prohibiting the battle flag? There must be a nexus to the expression. And what the district court— So your answer would be what? My answer would be, unless it is connected to the battle flag, it should not be banned. It wasn't in his hypothetical. I said they didn't fight the battle flag in my hypothetical. All the disruptions every year were fighting about the Civil War, fighting about slavery, fighting about the rights of this, eating your own life, this type of thing, making your own decisions, but no argument over the battle flag. Could the superintendent in that circumstance or the principal prohibit battle flags? I do not believe that Tinker would allow that, Your Honor, because what you're creating is a per se standard that says— If the battle flag is a symbol of the Civil War, it's a symbol of the dispute, it has caused, in larger context, enormous emotional response. And for you to make that kind of argument, I think it's sophistry. I don't understand quite why you're trying to latch on to such an untenable position. You have some strong positions because we do have First Amendment rights in schools. But to suggest that a school that has a history of strife, racial strife, between blacks and whites, in a context in South Carolina where the Civil War is still being discussed, the flag on the Capitol grounds is still being discussed, the disputes in the overall community about wearing the battle flag in public places is still being discussed, and you're saying a superintendent or a principal couldn't ban the battle flag in that context? Your Honor, I know my time is far exceeding. May I respond? Yes. Your Honor, the issue here is whether there is a contemporaneous nexus to the battle flag to justify the ban. I'm asking whether that nexus is there in my hypothetical. I don't believe the nexus is there. All right. And I don't believe the nexus is there in this case because the strife that we speak of is in the record. If you don't think it's in his hypothetical, you wouldn't think it's in this case. And he made a more extreme hypothetical, and you don't even accept that. The record of racial strife in this school occurred decades before. No, my hypothetical wasn't that. My hypothetical was ongoing yearly strife between blacks and whites over the Civil War, over slavery, over the right to have slaves and this type of thing and the heritage, but no use of the battle flag. And I'm saying could the school prohibit battle flags being displayed in that context? And you said no. And I think Tinker requires you to say no based on that nexus. All right. What we've created here, Your Honors, is a situation where the Confederate battle flag is being treated as per se racist. Let me suggest something to you. I think, Judge Niemeyer, I tried to tell you this. You may well have some good arguments, and in some factual situations, you may well have some winning arguments. But you seem to latch on an argument. I think if you were to sit back and think about it, it's not particularly persuasive, correct, or a good argument. And your answer is hypothetical because that tells us you hold such an absolutist view of what the law is that it's just not persuasive to us because the law is not that absolutist. And I'll say you could have discussions about can hecklers control other's free speech rights. You can talk about that. You did make an argument about contemporaneous and how much the history had to be and how close it had to be to this subject. But your answer to his question, just ignore all of that. I'll let you respond for a few seconds or half a minute if you need to. Thank you, Your Honor. Your Honor, the trouble I see with this is we are creating an automatic per se issue of disruption in regards to the battle flag. The hypothetical was intended to figure out whether the battle flag, if it came into the school in the context I hypothesized, whether it would cause disruption. And I can suggest to you that every person from South Carolina would say that would cause disruption in that context. And you're saying there's no connection. We do not know what or if. Again, we have to reasonably forecast. And we're suggesting that racism equals an automatic disruption. I didn't say racism. I said in arguments about the Civil War, arguments about slavery, arguments about blacks and whites and these disruptions going on yearly in the school. That was my hypothetical. And Tinker suggests that even arguments are not enough unless those arguments reach the level of disruption. And that's different. It's much different when you start talking about a history of fights and a history of actual violence. Let's add some fights in there in my hypothetical. Could they still ban the battle flag? They never mentioned it during those fights. That's certainly a different circumstance. What's your answer? Yes. All right. Thank you. May I briefly conclude, Your Honor, if I may? Of course. Our concern here is a per se ban by the battle flag is equated to racism, which means that there's an automatic disruption. And that's not the case in this record. I thought the principals, and to be fair with the record, I thought the administrators of this school had concluded that the battle flag is a symbol that would provoke disruption in the context of their history. That was their judgment. And so they banned display of the battle flag because they anticipated disruption as a result of that. That's what I thought the record showed. Now, you may be right or wrong, but that's what I thought. You disagree with that? I do disagree. And thankfully, Your Honor, there hasn't been that disruption. No, I'm asking you their position. That is their position. And I believe that Lata's good management of their school certainly warrants not more restrictions in this regard, but an expansion of free speech. And I'll leave you with this, and this is directly from Tinker. Our Constitution says we must take the risk when it comes to the First Amendment. Our history says it is this sort of hazardous freedom, this openness that is the basis of our national strength and of independence and vigor of Americans who grow up and live in this relatively permissive, but often disputatious, society. That applies here, and it applied 40 years ago with those arms. Thank you very much. Thank you, Your Honor. We'll come down in Greek Council, and I do want to express my appreciation to both Council. This is the ultimate access under free speech and to the courts, and, of course, we have students here who recognize that. But we can all be proud that we're having this open debate about this difficult subject, and I do want to thank Council. And we'll come down in Greek Council, proceed on to the next case.
judges: Paul V. Niemeyer, Dennis W. Shedd, G. Steven Agee